**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3090
_____

UNITED STATES OF AMERICA

v.

LINDA TODD,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2-14-cr-00320-001)
District Judge: Honorable Gene E. K. Pratter
_____

Argued June 5, 2018
_____

Before: AMBRO, JORDAN and VANASKIE, *Circuit Judges*

(Opinion Filed: December 14, 2018)

Jacob Schuman, Esq. [**Argued**]
Christy Martin, Esq.
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant*

Emily McKillip, Esq. [**Argued**]
K. T. Newton, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250

Philadelphia, PA 19106
*Counsel for Appellee*

_____

OPINION

_____

VANASKIE, *Circuit Judge*.

In *Tapia v. United States*, 564 U.S. 319, 335 (2011), the Supreme Court made clear that "a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." Recently, in *United States v. Schonewolf*, 2018 WL 4782146 (3d Cir. Oct. 4, 2018), we concluded that this prohibition applies to revocations of supervised release, overruling our previous decision in *United States v. Doe*, 617 F.3d 766 (3d Cir. 2010). We also took the opportunity in *Schonewolf* to join the First, Second, Fourth, Fifth, Sixth, and Eighth Circuits in holding that, to violate *Tapia*, rehabilitation must have been a primary or dominant factor in a district court's decision to impose a term of incarceration. *Schonewolf*, 2018 WL 4782146, at *7–8.

The District Court revoked Appellant Linda Todd's supervised release before we decided *Schonewolf*. We write today to illustrate the contrast between the facts of our case and the facts presented in *Schonewolf*. Whereas we found no *Tapia* error in *Schonewolf*, we think it clear that, here, *Tapia* was violated. But because Appellant did not object in the District Court to revocation of supervised release and the resulting sentence, we apply the plain error standard of review, s*ee United States v. Berry*, 553

2

F.3d 273, 279 (3d Cir. 2009), and conclude that Todd has not demonstrated the requisite prejudice affecting her substantial rights to justify setting aside the District Court's Order. Accordingly, we will affirm the Order of the District Court revoking Todd's supervised release.

I.

We begin by recounting Todd's history of substance abuse and the judicial proceedings in this matter, which are deeply intertwined.

The parties agree Todd has struggled with drug addiction for many years. Prior to the proceedings in this case, Todd was hospitalized several times for substance-abuse disorders and was convicted of several drug-related crimes.

In 2014, Todd pled guilty to participation in a bank-fraud and identity-theft scheme. The District Court sentenced her to thirteen months of imprisonment, followed by sixty months of supervised release. As conditions of her supervised release, Todd was required to abstain from illegal substances, report to her probation officer, and, in particular, report to her probation officer for drug testing.

Following her release from prison in March 2015, Todd began her period of supervised release. For the first year and a half of her supervised release term, she complied with her conditions. In the fall of 2016, however, Todd relapsed: she tested positive for cocaine, morphine, oxycodone, and oxymorphone in September, October, and November. She also missed several drug tests. As a result, her probation officer directed her to enroll in an intensive outpatient program to treat her addiction and mental health issues. In addition, Todd was given permission to enroll in a Suboxone

3

maintenance program.  Although she initially reported to these programs as directed, she was eventually discharged after missing several appointments.

Todd continued to struggle with substance dependence through the winter.  In January 2017, she enrolled in a five-day detoxification program, but dropped out one day before she was scheduled to finish.  She then joined another intensive outpatient and Suboxone maintenance program, but stopped attending a few weeks later.  Around this time, Todd also stopped communicating with her probation officer.

In February 2017, Todd's probation officer filed a petition asking the court to issue a summons directing Todd to appear and modify the conditions of her supervised release.  In particular, the probation officer sought to add as a condition of supervised release thirty days of inpatient treatment.  A month later, Todd's probation officer filed a Violation of Supervised Release petition, alleging that Todd had violated the conditions of her release by using drugs, failing to complete treatment, and failing to report to her probation officer as directed.  This petition superseded the one from February.  Pursuant to the petition, Todd was arrested and brought before the District Court for a hearing.

At the hearing, Todd's probation officer proposed that the District Court modify the conditions of Todd's release to require participation in a drug treatment program.  Both Todd and the government agreed that treatment was necessary.  Accordingly, the District Court modified her conditions to require her to attend sixty days of inpatient treatment, followed by ninety days of outpatient treatment.  The District Court emphasized this was "another chance," with "a little bit closer supervision."  (App. 104.)

4

Todd completed the inpatient program in April 2017. In June 2017, she began the outpatient program at a residential reentry center. In August 2017, she relapsed again. She tested positive for cocaine and opioids, and confided to her probation officer that she had been using drugs.

On August 17, 2017, Todd overdosed on heroin. Staff at the reentry center administered Narcan, an opioid blocker, and transported her to the hospital, where she was revived. When the staff searched her personal belongings, they found ten small bags of heroin along with drug paraphernalia. The next day, Todd was discharged from outpatient treatment.

After the overdose, Todd's probation officer sought revocation of her supervised release. The officer filed another Violation of Supervised Release petition, alleging that Todd had again violated the conditions of her release by using drugs, failing to complete outpatient treatment, and missing meetings with the probation officer. Todd was arrested and appeared for a second hearing.

At this hearing, Todd's probation officer recommended that the District Court revoke Todd's supervised release and sentence her to twelve months of incarceration, followed by twenty-four months of supervised release. The government agreed. Todd opposed and requested that the District Court place her in a drug treatment program instead of prison. Defense counsel noted Todd had done well in the inpatient program, held a job, and had support from her family. Defense counsel further explained that, although Todd had relapsed during outpatient treatment, drug use was endemic at the reentry center, which made it a difficult environment in which to maintain sobriety.

5

Defense counsel also stressed that while battling opioid dependence was "a long road," the overdose had been "a wake-up call" for Todd. (App. 118–19.)

The Court then engaged Todd in a colloquy. Todd expanded on her history of drug use, her recent overdose, her varying degrees of success in inpatient and outpatient programs, and her aspirations of becoming a drug and alcohol addiction counselor. She also emphasized that she had made progress during inpatient treatment, but had succumbed to the rampant drug use in the outpatient facility. In response, the District Court questioned whether Todd had "a grip on the reality of the risk of overdosing," stating,

> [I]f . . . you think that you're doing well and that everything would have been fine as long as you hadn't gone to [the reentry center], I'm not sure that you're really thinking about the big picture and what you have to face in life because in the final analysis, none of these programs are successful unless they click with you and you're able to monitor yourself.

(App. 122.) The District Court also expressed concern that Todd was demonstrating neither "personal accountability," nor "responsibility . . . ." (App. 123.) As an example, the Court noted that Todd had repeatedly sought out drugs in the reentry center on her own accord.

Ultimately, the District Court revoked Todd's supervised release and sentenced her to twelve months and one day's imprisonment,[1] followed by twenty-four months' supervised release. The District Court explained:

---

[1] The District Court extended the prison sentence to twelve months and one day at defense counsel's request so that Todd could earn good-time credit. (App. 134–35.)

6

> Well, Ms. Todd, certainly the plan that we had hoped would work does not work and it hasn't yet clicked with you and what you really must have is ongoing 24/7 supervision.
>
> So in connection with revoking your supervised release, I am going to send you back to prison for a period of [twelve] months during which it would be my expectation that you will be participating in both mental health treatment programs and drug addiction treatment programs. Upon your completion of the [twelve] months of incarceration, you will return to supervised release for [twenty-four] months.

(App. 133–34.) In imposing this sentence, the District Court did not calculate her range under the United States Sentencing Guidelines ("U.S.S.G.");[2] nor did it discuss the sentencing factors set out in 18 U.S.C. § 3553(a). Other than finding that Todd had committed the violations and noting the violations were "C violations," (App. 132), the District Court made no reference to the Guidelines. Todd timely appealed her sentence.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Todd raises two challenges to the District Court's order revoking her supervised release. First, she contends the revocation violated *Tapia*. Second, she argues the District Court's failure to calculate and consider her Guidelines' range amounted to reversible error. Because neither challenge was presented to the District Court, we review for plain error. *See Berry*, 553 F.3d at 279. Plain error is error that is obvious or clear and that affects substantial rights. *See United States v. Olano*, 507 U.S. 725, 732–

---

[2] The parties agree the applicable range was eight to fourteen months' imprisonment.

7

37 (1993). "Generally, an error affects substantial rights when it is prejudicial, *i.e.*, it 'affected the outcome of the district court proceedings.'" *United States v. Dragon*, 471 F.3d 501, 505 (3d Cir. 2006) (quoting *Olano*, 507 U.S. at 734). Even if plain error occurred, we will exercise our discretion to correct the error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Olano*, 507 U.S. at 736) (alteration omitted).

III.

We begin by assessing whether the District Court erred under *Tapia*. Before turning to the facts of Todd's case, however, we summarize the relevant provision of the Sentencing Reform Act and the decisions in *Tapia* and *Schonewolf*.

A.

In 1984, Congress passed the Sentencing Reform Act, which "channeled judges' discretion by establishing a framework to govern their consideration and imposition of sentences." *Tapia*, 564 U.S. at 325. In relevant part, the Act provides:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). This provision, as the Supreme Court explained, reflects lawmakers doubts "that prison programs could 'rehabilitate individuals on a routine basis'—or that parole officers could 'determine accurately whether or when a

8

particular prisoner ha[d] been rehabilitated.'" *Tapia*, 564 U.S. at 324–35 (quoting S. Rep. No., 98–225, at 40 (1983)).

In *Tapia*, the Supreme Court considered whether a district court's reference to the Bureau of Prison's Residential Drug Abuse Program during its sentencing of Alejandra Tapia ran afoul of § 3582(a). 564 U.S. at 335. The Court affirmed that § 3582(a) prevented a court from "impos[ing] or lengthen[ing] a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." *Id.* The Court's interpretation rested in part on the fact that, as Congress had recognized in passing the SRA, "imprisonment is not an appropriate means of pursuing [rehabilitation]." *Id.* at 328.

In *Schonewolf*, we considered whether *Tapia*'s interpretation of § 3582 extends to revocations of supervised release. Joining all other Courts of Appeals that have considered the issue, we concluded that it did. *See* 2018 WL 4782146, at *5–6 (citing *United States v. Molignaro*, 649 F.3d 1, 5 (1st Cir. 2011) (Souter, J.); *United States v. Lifshitz*, 714 F.3d 146, 150 (2d Cir. 2013); *United States v. Bennett*, 698 F.3d 194, 198 (4th Cir. 2012); *United States v. Garza*, 706 F.3d 655, 657 (5th Cir. 2013); *United States v. Deen*, 706 F.3d 760, 766 (6th Cir. 2013); *United States v. Taylor*, 679 F.3d 1005, 1006 (8th Cir. 2012); *United States v. Grant*, 664 F.3d 276, 280 (9th Cir. 2011); *United States v. Mendiola*, 696 F.3d 1033, 1043 (10th Cir. 2012); *United States v. Vandergrift*, 754 F.3d 1303, 1309 (11th Cir. 2014)).

Next, we determined the applicable standard for discerning *Tapia* error in post-revocation sentences. We recognized a split among the Circuits. "On one hand," we

9

wrote, "the Seventh, Ninth, Tenth, and Eleventh Circuits impose a stringent standard . . . . In the view of these circuits, *Tapia* is violated wherever rehabilitation is given any weight in the decision to impose or lengthen a prison sentence." *Id.* at \*6 (citing *United States v. Spann*, 757 F.3d 674, 675 (7th Cir. 2014); *United States v. Joseph*, 716 F.3d 1273, 1281 n.10 (9th Cir. 2013) (dictum)); *United States v. Thornton*, 846 F.3d 1110, 1116 (10th Cir. 2017); *Vandergrift*, 754 F.3d at 1310 (11th Cir. 2014)). "On the other hand," we continued, "the First, Second, Fourth, Fifth, Sixth, and Eighth Circuits have articulated a more relaxed standard . . . . Under this standard, rehabilitation may be a factor granted some weight in selecting a prison sentence, so long as it is not the primary or dominant consideration." *Id.* at \*7 (citing *United States v. Del Valle-Rodrigues*, 761 F.3d 171, 174 (1st Cir. 2014); *Lifshitz*, 714 F.3d at 150 [2d Cir.]; *Bennett*, 698 F.3d at 201 [4th Cir.]); *Garza*, 706 F.3d at 660 [5th Cir.]; *Deen*, 706 F.3d at 768 [6th Cir.]; *United States v. Replogle*, 678 F.3d 940, 943 (8th Cir. 2012)). We joined the latter cohort, reasoning that the less stringent standard "tracks *Tapia* more closely" and comports with our approach in the post-conviction setting. *Id.* at \*7–8 (citing *United States v. Zabielski*, 711 F.3d 381, 392 (3d Cir. 2013)).

We concluded by turning to the relevant circumstances of Schonewolf's personal and criminal background. Her experiences with addiction began early in life. Both of her parents were addicts and she herself began using drugs and alcohol in her teenage years. At some point, she was prescribed Percocet for back pain stemming from a car accident. Over time she became dependent on the pills. After she was no longer able to secure Percocet, she switched to heroin to salve her addiction. In 2010, Schonewolf pled

10

guilty to one count of possessing methamphetamine with intent to distribute. The district court varied downward, sentencing her to time served and sixty months of supervised release.

Schonewolf served the first part of her supervised release without incident. Then she relapsed. She proceeded to violate her supervised release multiple times—she was caught attempting to purchase drugs; she overdosed; and, ultimately, she pled guilty to selling heroin. As a result, her probation officer sought revocation. The district court convened a hearing. After listening to the parties, it varied upward and sentenced Schonewolf to forty months' imprisonment. It explained that its downward variance during post-conviction sentencing justified an upward variance pursuant to U.S.S.G. § 7B1.4.[3] Additionally, the court observed that Schonewolf posed a danger to herself and society. It also mentioned that limited contact with the outside world, presumably through incarceration, was "the last step we have in order to give you a fighting chance to recover from whatever addictions you have . . . ." *Id.* at \*3.

On appeal, Schonewolf claimed that her post-revocation sentence violated *Tapia*. She argued that many of the district court's statements were "addiction-centric and framed the choice [of sentence] in terms of treating her addiction." *Id.* at \*8 (citations omitted). We disagreed. We held the sentence "was not based on rehabilitation but, instead, on past lenity." *Id.* We were persuaded by, *inter alia*, the district court's express reliance on U.S.S.G. § 7B1.4.

---

[3] Application Note 4 to U.S.S.G. § 7B1.4 provides: "Where the original sentence was the result of a downward departure . . ., an upward departure may be warranted."

11

B.

We write today because we believe Todd's sentence is distinguishable from Schonewolf's. In *Schonewolf*, the district court based its sentence on the permissible consideration of past lenity.[4] By contrast, in determining Todd's sentence, the District Court focused on the rehabilitative benefit prison could provide.

Having reviewed the record before us, we conclude that rehabilitation was the District Court's primary basis for imposing a term of incarceration. We are particularly persuaded by its reference to the "ongoing 24/7 supervision" available in prison. (App. at 133.) Before making this statement, the Court discussed its concern with drug treatment programs that provided less than continuous supervision. It recognized that these programs had not succeeded in helping Todd overcome her addiction. By contrast, the "24/7 supervision" available in prison presented an alternative to these drug treatment programs. We also note that, throughout this matter, the proceedings have centered on Todd's substance abuse. The transcripts almost exclusively discuss Todd's history of substance abuse, treatment needs, and ongoing attempts to maintain sobriety. This bolsters our conclusion that the District Court was primarily motivated by its interest in promoting Todd's rehabilitation.

The government argues that while the District Court "may have shown a hope that Todd would avail herself of [rehabilitation] programs while incarcerated," (Appellee's

---

[4] We note that the district court in *Schonewolf* also discussed public safety as justification for its sentence, but we did not rely on this fact in our decision on appeal. *See id.* at *3 (noting that district court judge considered Schonewolf to be "a significant danger to society").

12

Br. at 19), rehabilitation was not its primary motivation in revoking Todd's supervised release. In support of its position, the government points to several statements that ostensibly prove the District Court relied on non-rehabilitative factors. First, the government submits that the District Court's references to "personal accountability" and "responsibility" were unrelated to Todd's treatment needs; and second, the government contends the District Court's reliance on the need for "ongoing 24/7 supervision" reflected the seriousness and number of Todd's violations. (Appellee's Br. at 19–20.)

We are not convinced. We decline to review these statements in isolation, and when read in context, it is clear that they were all related to Todd's addiction. First, the District Court's references to "personal accountability" and "responsibility" were part of its inquiry into Todd's experiences at various treatment programs. This colloquy mainly focused on Todd's success with inpatient programs compared to her inability to maintain her sobriety while participating in outpatient programs. And when Todd explained to the District Court that she thought her overdose was traceable to the lax conditions at the reentry center, the Court rejected the explanation, suggesting the more pressing issue was Todd's inability to hold herself personally accountable for the lapses in her own sobriety.

The government's argument regarding "ongoing 24/7 supervision" fares no better. Admittedly, 24/7 incapacitation accompanying incarceration can be used to advance deterrence and public safety, which are permissible considerations when deciding whether to impose a term of imprisonment. *See United States v. Del Valle-Rodriguez*, 761 F.3d 171, 175 (1st Cir. 2014). However, nothing here suggests the District Court was concerned with anything other than Todd's rehabilitation. For instance, this

statement regarding 24/7 supervision followed a lengthy discussion of Todd's inability to complete outpatient treatment in which the amount of supervision was a pivotal issue. We also note that this statement was not the first time the District Court addressed Todd's need for supervision. It had done so before at Todd's first hearing where it modified the terms of her supervised release. After expressing concern about the "freedom" permitted "at the halfway house," the Court ordered sixty days of inpatient treatment followed by ninety days of outpatient treatment. The Court emphasized that this would provide "a little bit closer supervision." (App. 104.) In other words, more supervision meant a better shot at sobriety.

We have carefully considered and compared these proceedings to those at issue in *Schonewolf*. Our conclusion in *Schonewolf* rested on our ability to discern permissible considerations motivating a district court's imposition of a term of incarceration, *i.e.,* express reliance on U.S.S.G. § 7B1.4. Because we cannot identify any consideration other than rehabilitation on this record, we conclude that Todd's post-revocation sentence violated *Tapia*.

This is not to say that District Court's decision to address Todd's concerns regarding her rehabilitative needs while incarcerated was improper. In fact, we commend the Court for directly confronting the reality of Todd's addiction. We write only to underscore that a court may not rely primarily on rehabilitation in imposing a term of incarceration, and that we are unable to discern a basis other than rehabilitation from the record before us.

We are aware that the recent decision in *Schonewolf* marks our first clear statement on the application of *Tapia* to revocations of supervised release and the extent to which a court may consider rehabilitation when imposing a term of incarceration. Nonetheless, we are constrained to conclude that the error here was obvious. *See United States v. Dahl*, 833 F.3d 345, 358 (3d Cir. 2016) ("[W]e apply . . . 'plain error' as of the time of appellate review") (quoting *Henderson v. United States*, 568 U.S. 266, 274 (2013)). Still, we are convinced that Todd has failed to demonstrate a reasonable probability that she would have received a more favorable sentence had the District Court rested its decision on permissible grounds. We recognize that a legitimate basis for imposing a term of incarceration existed in Todd's case, as it did in Schonewolf's. In particular, we note that Todd admitted violating the terms of her supervised release and was sentenced within the applicable Guidelines range. Relief for an error that is obvious or clear is warranted only where the error is prejudicial, *i.e.,* where it "affected the outcome of the district court proceedings." *Dragon*, 471 F.3d at 505 (quoting *Olano*, 507 U.S. at 734). Here, Todd has not shown that the District Court would not have otherwise revoked supervised release and imposed a prison term, especially in view of the repeated violations of supervised release detailed above. Nor can we say that the *Tapia* error here adversely affected the fairness, integrity, or public reputation of judicial proceedings. *See Olano*, 507 U.S. at 732. On the contrary, the District Court displayed tremendous patience and a remarkable concern for fairness to Todd. Applying plain error review, as we are required to do under the circumstances, we will not disturb the District Court's revocation order and sentence on *Tapia* grounds. *See id.* at 734–35.

15

IV.

We conclude by addressing Todd's alternative argument—*i.e.*, that the District

Court failed to properly calculate or consider her Guidelines' range. We agree that this

was a procedural error. *See United States v. Gall*, 552 U.S. 38, 51 (2007) (holding that an

appellate court "must first ensure that the district court committed no significant

procedural error, such as failing to calculate (or improperly calculating) the Guidelines

range"). We are not, however, convinced Todd has demonstrated prejudice. Todd

received a term of imprisonment of twelve months and one day for violating the terms of

her supervised release. The Guidelines' range she faced was eight to fourteen months.

Nothing in this case suggests that Todd would have received a more favorable sentence

had the District Court calculated and considered this range on the record. Because Todd

has not demonstrated prejudice, we decline to find plain error. *See Olano*, 507 U.S. at

734.

V.

For the foregoing reasons, we will affirm the District Court's Order revoking

Todd's supervised release entered on September 14, 2017.

16